# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> MARSHALL POLK, <br><br> Defendant. | No. 13-CR-2011 CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

## I.  INTRODUCTION

This matter is before the Court on defendant's Amended Motion for Compassionate Release filed on June 30, 2020. (Docs. 179 & 180). On July 8, 2020, the government timely filed a resistance. (Doc. 181). On July 13, 2020, defendant timely filed a reply. (Doc. 183). For the following reasons, the Court **denies** defendant's motion.

## II.  RELEVANT BACKGROUND

From as early as January 2012 through March 2013, defendant was a member of a conspiracy to distribute cocaine. (Doc. 100, at 5). Defendant was a source of cocaine in Waterloo, Iowa. (Doc. 100, at 5). He sold cocaine to customers and often instructed his co-conspirators to handle transactions on his behalf while he handled the money. (*Id.*). In January 2012, defendant made three trips to Madison, Wisconsin with T.M. to purchase cocaine. (*Id.*). On one occasion, the two purchased $20,000 worth of cocaine. (*Id.*). Defendant also made trips to Madison without T.M. (*Id.*). From October 2012 to March 2013, defendant sold cocaine on at least five occasions. (*Id.*, at 6). Three of these transactions were with confidential informants and one took place at defendant's

residence which was within 1,000 feet of a playground. (*Id.*). On March 14, 2013, officers executed a search warrant at defendant's residence and recovered a small amount of marijuana, a box and ammunition for a handgun, and possible drug notes. (*Id.*, at 7). That same day, officers executed another search warrant at defendant's girlfriend's residence and recovered a loaded handgun in a case as well as $3,847. (*Id.*). The handgun, which defendant's girlfriend claimed to own, was underneath a bed that defendant and his two minor children were laying on when officers arrived. (*Id.*).

On May 7, 2013, a grand jury issued an Indictment charging defendant with five offenses, including conspiracy to distribute cocaine in violation of Tile 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), 846, and 860 ("Count 1"). (Doc. 4). On May 14, 2013, officers arrested defendant. (Doc. 11). That same day, defendant pleaded not guilty and was detained. (Doc. 15). On May 15, 2013, defendant was released pending trial. (Doc. 25). While on release, defendant tested positive for use of controlled substances three times. (Doc. 100, at 3–4). Defendant alleged his first positive result for marijuana was due to residual use, his second positive result for codeine and cocaine was due to his valid prescription for codeine cough syrup, and his third positive result for marijuana and cocaine was a "set up." (*Id.*, at 3). On July 1, 2013, defendant changed his plea to guilty on Count 1 pursuant to a plea agreement with the government. (Docs. 75-1 & 77). On July 16, 2013, the Court accepted defendant's plea. (Doc. 80).

On August 21, 2013, the United States Probation Office filed defendant's final presentence investigation report. (Doc. 100). Defendant was, at that time, 30 years old. (*Id.*, at 2). He was raised by his mother and described his childhood as "great" despite not knowing his father. (*Id.*, at 14). Defendant had four children across two relationships. (*Id.*). Defendant dropped out of school in ninth grade and had never been employed. (*Id.*, at 16–17). In 2005, at approximately age 22, defendant was involved in a car accident "which left him paralyzed." (*Id.*, at 15). Defendant reported he had

2

"very little use of his arms and fingers." (*Id.*). Defendant took pain and nerve medications as well as muscle relaxers. (*Id.*). Defendant received disability benefits since 2005. (*Id.*). Defendant was diagnosed with "late effect spinal cord injury" and lower "paraplegia" as well as chronic pain. (*Id.*). He also used a suprapubic catheter and was on nine different medications. (*Id.*). Defendant also suffered from depression and had been treated for insomnia. (*Id.*, at 16). He reported normal use of alcohol and long running but minor use of marijuana. (*Id.*). Medical records reflect defendant was evaluated for drug treatment in 1999 and underwent drug treatment in 2000, at which time he reported daily use of marijuana. (*Id.*). Defendant, despite fulfilling all the requirements of the program, "ran away" from the treatment center before completion and was ultimately discharged. (*Id.*).

Defendant's criminal history was significant. In 1999, at age 16, defendant was convicted of possession of marijuana in individual baggies. (*Id.*, at 10). During that offense, defendant gave officers a false name and false information, left the scene of a car accident, and obstructed traffic. (*Id.*). Despite testing positive for marijuana multiple times, having poor school attendance, violating his supervision order, incurring additional criminal charges, failing to return to his foster care placement, and absconding from supervision, the state did not revoke his probation. (*Id.*). From ages 18 to 20, defendant was convicted of driving on a suspended license or while barred four times, on one occasion providing a false name, on a second occasion travelling 65 miles per hour in a 30 mile per hour zone, refusing to stop for officers, and ultimately fleeing the scene on foot, and on a third occasion fleeing on foot again. (*Id.*, at 11–12). Defendant was convicted of possession of marijuana twice at age 20, one of which involved possessing individual baggies of marijuana. (*Id.*, at 12). At age 21, defendant was convicted of possession of cocaine and two assaults, both against women. (*Id.*, at 12–13). A hearing was scheduled on revocation of defendant's probation, but defendant was

3

instead discharged from probation because he became paralyzed. (*Id.*). Despite his paralysis, at age 27 defendant was convicted of possession with intent to deliver marijuana and ecstasy. (*Id.*, at 13). Prior to the instant offense, the longest single term of incarceration defendant had served was about six months. (*Id.*, at 12).

On October 10, 2013, the Court sentenced defendant.[1] (Doc. 123). Defendant was in criminal history category V with a total offense level of 34, yielding an advisory guideline range of imprisonment of 235 to 293 months followed by eight years to life on supervised release. (Doc. 100, at 18). Defendant moved for a downward variance based on, among other things, his lack of significant prior incarceration. (Doc. 109, at 7–13). The Court denied defendant's motion and sentenced him to 200 months' imprisonment followed by eight years on supervised release. (Doc. 124). On October 24, 2013, defendant timely appealed his sentence. (Doc. 133). On April 22, 2014, the Eighth Circuit Court of Appeals affirmed. (Doc. 151).

On February 3, 2015, defendant filed a pro se motion to reduce his sentence. (*Id.*, at 158). On April 17, 2015, the Court granted defendant's motion and reduced his sentence to 151 months' imprisonment followed by eight years on supervised release. (Doc. 161). On June 11, 2020, defendant filed a second pro se motion to reduce his sentence and motion to appoint counsel. (Docs. 171 & 172). After the Court granted defendant's motion to appoint counsel (Doc. 173), defendant filed his amended motion now before the Court on June 30, 2020 (Doc. 179). Defendant is currently incarcerated at MCFP Springfield with a projected release date of October 6, 2024. (Doc. 180, at 3).

---

[1] Before his sentencing, defendant publicly posted on his Facebook account that he was being treated unfairly, that he was only caught with a relatively small amount of drugs because someone wore a wire, and that others should "pack" the courtroom to "watch" a witness testify against him. (Doc. 123–2).

### III.     COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration

5

due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV. DISCUSSION

#### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

6

On June 26, 2019, defendant completed a Reduction in Sentence ("RIS") Application and submitted it to the warden of his facility. (Doc. 180–1). On July 22, 2019, the RIS Committee found defendant met "the criteria for RIS consideration." (Doc. 180–2). On May 12, 2020, the Assistant Director and General Counsel of the BOP, while acknowledging defendant's medical conditions, denied defendant's request effectively based on the 3553(a) factors. (Doc. 180–3).

Defendant submitted his request long before the COVID-19 pandemic arose, but the BOP denied his request during the pandemic. The government argues defendant has not exhausted his administrative remedies because "the BOP should be given the opportunity to review defendant's request based on the COVID-19 pandemic[.]" (Doc. 181, at 12).

This Court has "previously held that a defendant need not mention COVID-19 in his administrative request for compassionate release if his release request is based on health conditions and predates the COVID-19 pandemic." *United States v. Campbell*, No. CR03-4020-LTS, 2020 WL 3491569, at *4 (N.D. Iowa June 26, 2020). "So long as the defendant's request was denied by the BOP at a time which necessarily entailed consideration of the COVID-19 pandemic, the Court is unconcerned whether the request itself mentioned the pandemic." *United States v. Smith*, No. 04-CR-2002-CJW-MAR, 2020 WL 3913482, at *4 (N.D. Iowa July 10, 2020); *see also Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) ("The COVID-19 pandemic merely accentuates [the defendant's] meritorious claims for release."). Here, because defendant submitted his request before the pandemic, but the BOP denied it at a time when the BOP necessarily considered the pandemic in its determination, the Court finds the BOP had a sufficient opportunity to consider defendant's health conditions in light of COVID-19. Thus, because 30 days have elapsed since defendant submitted his request to the warden, the Court finds he has fulfilled the exhaustion requirement of

Section 3582(c)(1)(A) even though his request predates the pandemic. *See Smith*, 2020 WL 3913482, at *4.[2]

### B.  *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 180, at 12–16). Defendant cites his asthma and paralysis. (*Id.*, at 13). The government concedes defendant's conditions "may" present an extraordinary and compelling reason under USSG Section 1B1.13 because they limit his ability to provide self-care, but that a sentencing reduction is not warranted as to COVID-19. (Doc. 181, at 13–14).

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases); *see also People Who are at Increased Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html.

Defendant's medical records do not mention asthma. (Docs. 100, 180–5, 180–6, & 180–7). His respiratory rate is within normal range and he has not reported any respiratory distress. (Doc. 180–5, at 5, 11, 20, 44, 49, 57, 66, 101, 110, 111, 119, 177). Defendant did not allege that he had asthma in his pro se motion for release.[3]

---

[2] In his reply, defendant notes that he sent an updated request for release to the BOP on July 2, 2020, which specifically mentioned COVID-19. (Doc. 183, at 1–2). In light of the Court's analysis above, it need not consider this additional request.

[3] Defendant's pro se motion, unlike his amended motion now before the Court, alleges he suffers from hypertension. (Doc. 171, at 1–4). The record reflects defendant has essential hypertension, which is medicated and "well-controlled." (Doc. 180–5, at 29, 30) (typographical error

8

Case 6:13-cr-02011-CJW-MAR   Document 185   Filed 07/22/20   Page 8 of 13

(Doc. 171, at 1–4). The Court, like the government, is unable to find any asthma diagnosis in the record. *See* (Doc. 181, at 14). Thus, based on the current record, the Court has no basis to conclude defendant suffers from asthma.

The record shows, however, that defendant is an incomplete quadriplegic. (Doc. 180–5, at 17, 30). Persons with an incomplete spinal cord injury still have movement and sensation in at least some of their limbs to some extent. *Incomplete Spinal Cord Injuries: The Early Days*, Craig Hospital, https://craighospital.org/resources/incomplete-spinal-cord-injuries-the-early-days. Defendant cannot move his legs but can move his arms to some extent despite significant muscular atrophy.[4] (Doc. 180–5, at 30). When not in his bed, defendant always uses an electric wheelchair. (Docs. 180–2, at 1; 180–5, at 90; Doc. 180–6, at 4). The extent to which defendant can use his arms is not described in detail, but it is noted that he is limited to gross motor skills in his arms. (Doc. 180–6, at 90). The RIS Committee commented that defendant is highly dependent on assistance to move and perform basic daily activities. (Doc. 180–2, at 1). Such activities include "bathing, dressing, grooming, toileting, transferring, doing laundry,

---

omitted). His blood pressure is consistently normal, elevated on occasion, and rarely in any stage of hypertension. (*Id.*, at 11, 20, 29, 44, 47, 49, 54, 66, 94, 101, 119, 159, 177, 187; Doc. 180–6, at 6–8). Thus, his hypertension appears to be well-managed. Further, essential hypertension, unlike pulmonary hypertension, is not known to increase a person's susceptibility to COVID-19. *People of Any Age with Underlying Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions. Given that defendant's essential hypertension does not appear to be particularly serious, the Court will not consider it in its analysis here. *See United States v. Johnson*, No. 12-CR-2024-CJW-MAR, 2020 WL 3913504, at *4 (N.D. Iowa July 10, 2020) (considering the defendant's essential hypertension to a limited extent because it was serious but not known to inherently raise his susceptibility to COVID-19).

[4] In his reply, defendant asserts he is a "'higher quadriplegic,' meaning that he cannot use his fingers at all, and cannot use his chest muscles to sneeze or cough." (Doc. 183, at 4). Based on the information discussed above, the Court acknowledges defendant has little to no use of his fingers, but there is nothing in the record that comments on defendant's limited ability to use his chest muscles.

9

keeping house, preparing meals, and managing his medication." (Doc. 180–3, at 2). The BOP agrees that defendant is "in a debilitated medical condition." (*Id.*). Notably, defendant has not deteriorated while incarcerated; "[he] was in [his] current physical condition at the time of his conviction and sentencing." (Doc. 180–2, at 1).

Defendant's incomplete quadriplegia seriously limits his ability to provide self-care and constitutes an extraordinary and compelling reason for release, even absent the COVID-19 pandemic. *See* USSG §1B1.13 cmt. n.1(A)(ii); *see also United States v. Curtis*, No. 03-533 (BAH), 2020 WL 1935543, at *2–3, *5 (D.C.D. Apr. 22, 2020) (noting defendant's advanced multiple sclerosis, causing incomplete quadriplegia and other conditions, rendered him unable to provide self-care). Defendant argues the Court should additionally consider the pandemic because his inability to provide self-care makes him particularly susceptible to COVID-19. (Docs. 180, at 13; 183, at 5). Defendant's incomplete quadriplegia does not itself make it more likely that he will suffer severe complications if exposed to COVID-19. Indeed, "[d]isability alone may not be related to higher risk for getting COVID-19 or having severe illness. Most people with disabilities are not inherently at higher risk for becoming infected with or having severe illness from COVID-19." *People with Disabilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html. It would obviously limit his ability to care for himself, however, if such complications arose. This is true for COVID-19 just as it is true for any other illness. Defendant is also likely at a greater risk of exposure to COVID-19 given that he is often in close physical contact with medical personnel. Currently, MCFP Springfield has only one active case of COVID-19 among its inmates and one other inmate who has recovered. *COVID-19*, BOP, https://www.bop.gov/coronavirus/. On balance, the Court affords limited weight to the pandemic because, although defendant is not at an elevated risk of severe complications, he does have a substantially limited ability to care for himself and is at an increased risk

10

of exposure. *See Curtis*, 2020 WL 1935543, at *5 (noting that, although defendant's multiple sclerosis causing incomplete quadriplegia, vision loss, and hypertension alone justified release, the pandemic added greater urgency).

Thus, the Court finds defendant has presented an extraordinary and compelling reason for release due to his hindered ability to provide self-care and, to a limited extent, the COVID-19 pandemic. The Court must also, however, consider this reason in tandem with the Section 3553(a) factors.

### C. *Section 3553(a) Factors and Danger to Community*

Defendant argues the Section 3553(a) factors favor release. (Doc. 180, at 16–18). Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's underlying offense is aggravating. He made multiple out-of-state trips to acquire large amounts of cocaine, personally sold cocaine, and often directed his co-conspirators to sell cocaine on his behalf. At least one of defendant's cocaine transactions occurred near a playground. Notably, the instant offense occurred in 2012 and 2013, approximately seven years *after* defendant became an incomplete quadriplegic. Prior to

11

his disability, defendant incurred four drug-related convictions. Including the instant offense, defendant incurred two drug-related convictions after his paralysis. His criminal history is also replete with providing false information, fleeing from officers, and driving violations. His aggravating offense and criminal history outweigh his somewhat mitigating upbringing, notably the absence of his father and apparent placement in foster care for a time.

While incarcerated, defendant has taken a significant number of courses. (Doc. 108–8, at 1–2). On the other hand, his disciplinary violations, although relatively minor in nature, are frequent in occurrence. His violations consist of trading money without authorization, smoking in an unauthorized area, using another inmate's phone account twice, possession of an unauthorized item, possession of a non-hazardous tool twice, possession of gambling paraphernalia, and disruptive conduct. (Doc. 180–9). His most recent violation occurred approximately a year ago. (*Id.*, at 1). It is noted, however, that defendant is purportedly "very social" and "gets along well with the other inmates." (Doc. 183–1). A social worker close to defendant states defendant is "very respectful" and "pleasant" with the staff. (*Id.*).[5] If released, defendant intends to reside with his girlfriend and their three minor children. (Doc. 180–10). Although defendant does not present a physical danger given his medical conditions, releasing defendant to a home with children is troubling given his repeated criminal conduct.

On balance, the 3553(a) factors do not warrant release despite defendant's limited ability to provide self-care amid the pandemic. Defendant has a recidivist criminal history

---

[5] The Court considers the social worker's letter as helpful evidence of defendant's character but rejects it to the extent it argues defendant's disciplinary violations are caused by BOP staff. (Doc. 183–1) ("Please consider the environment in which [defendant] lives and the many authoritarian personalities that he has to navigate on a daily basis.").

of drug-related offenses despite the punishment he has received in the past. The Court has no reason to believe defendant's incomplete quadriplegia will deter him from further drug-related criminal activity when his last two drug offenses were committed after his paralysis. Further, he played a substantial, organizing role in the conspiracy at issue.[6] Reducing his sentence by approximately 40 percent and placing him on home confinement would not sufficiently reflect the seriousness of his offense or provide just punishment in light of his criminal history.

Thus, the Court finds that the 3553(a) factors do not warrant release and **denies** defendant's motion on this basis.

### V. CONCLUSION

Defendant has failed to show that the 3553(a) factors favor release despite his medical condition. Thus, for the reasons discussed above, defendant's Amended Motion for Compassionate Release is **denied**. (Doc. 179).[7] Defendant must serve the remainder of his term of incarceration as previously directed. (Doc. 124).

**IT IS SO ORDERED** this 22nd day of July, 2020.

C.J. Williams
United States District Judge
Northern District of Iowa

---

[6] Defendant, despite acknowledging that he was properly assessed with an enhancement for his role in the offense at sentencing, asks that the Court ignore his role when reducing that same sentence. (Doc. 180, at 17). The Court rejects this argument as paradoxical.

[7] To the extent defendant's pro se motion for release is not superseded by his amended motion, the Court **denies** it as duplicative. (Doc. 171).